UNITED STATE DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**KENNETH GAINES**                                                         **CIVIL ACTION**

**VERSUS**                                                                 **NO. 05-707**

**ARMANDO ASARO, ET AL**                                                   **SECTION "N"(2)**


**ORDER AND REASONS**

        Before the Court is the Motion for Summary Judgment filed by Defendants in the above-captioned matter. The motion is opposed. Oral argument was heard on Defendants' motion on August 2, 2006, during which the Court requested additional briefing from the parties on the issue of qualified immunity. In response, both parties submitted additional memoranda to the Court. After considering all submissions of the parties, arguments offered during oral argument, and the pertinent law, the Court finds that Defendants' motion is well-founded. Accordingly, the Motion for Summary Judgment is **GRANTED**, and this matter is **DISMISSED WITH PREJUDICE**.

**I. BACKGROUND**

        Plaintiff, Kenneth Gaines, filed the above-captioned action against the City of New Orleans and several New Orleans Police Department ("NOPD") officers after being arrested for suspected participation in the murder of a store clerk, and then subsequently being released. According to the Complaint filed by Plaintiff, on March 9, 2004 at around noon, Plaintiff went to Kim's Supermarket, located on Loyola Avenue in New Orleans. As Plaintiff attempted to purchase

cigarettes at the front counter of the store, two masked men immediately entered. Upon noticing them, Plaintiff allegedly began to exit the store. As he was leaving, one of the masked men shot and killed Mai Thi Nguyen, who was behind the counter and was one of the owners of the store. The entire incident was caught on store surveillance cameras.

An enhanced version of the surveillance tape was released to the news media that afternoon. During WWL-TV's 6:00 p.m. news broadcast, the tape was aired. Jason Gagliano, an NOPD officer who worked security at Winn Dixie on Tchoupitoulas Street, saw the broadcast and recognized Plaintiff, who was a Winn Dixie employee. Gagliano notified homicide investigators. Consequently, Sargent Brett Thorne instructed Sargent Jeffrey Walls, Detective Matthew McCleary and Detective Jimmy Ward to bring a copy of the surveillance tape to Winn Dixie to confirm that the unmasked individual that appeared on the tape was Plaintiff. Plaintiff's manager so confirmed. When Plaintiff arrived at work that evening, Sargent Walls asked him to go to the 6th District police station. He agreed to do so and was transported, un-handcuffed, by Walls, McCleary and Ward to the station.

Armando Asaro, an NOPD officer, was designated as the lead detective for the investigation of the incident. Asaro took a recorded statement from Plaintiff late on the night of the incident. Plaintiff admitted that he was present at the scene when the shooting occurred, but he denied any involvement in the incident. Asaro also took statements from two eye witnesses, who described what they had seen. Plaintiff was then taken to the Intake and Processing Center of Orleans Parish Prison ("OPP"). He was incarcerated and remained at OPP from March 10th until March 24th, when a magistrate judge found no probable cause for his arrest.

On March 4, 2005, Plaintiff filed this suit, naming the City of New Orleans and

Officers Asaro, Walls, McCleary, Ward, and Steven Chiasson as defendants. In his Complaint, Plaintiff alleges that his arrest was made without probable cause and, therefore, constitutes an unlawful seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution. Accordingly, Plaintiff asserts that the named officers are liable to him under 42 U.S.C. § 1983 for compensatory damages, punitive damages and attorney's fees. Plaintiff also asserts that the actions of the officers constitute false arrest and battery, for which they are liable under Louisiana Civil Code article 2315. Finally, Plaintiff contends that the City is liable for the state law damages arising from the officers' actions under the theory of respondeat superior, since at all pertinent times, the officers were acting within the course and scope of their employment with the City.

Defendants filed the Motion for Summary Judgment before the Court on June 27, 2006. In their Memorandum, Defendants contend that Plaintiff's claims for improper seizure and false arrest under section 1983 should be dismissed because "the video of the incident establishes probable cause on its face" and because the officers who went to Winn Dixie to bring Plaintiff in for questioning are entitled to qualified immunity, as they did not arrest him and took no further action beyond requesting that Plaintiff report to the police station.

As to Plaintiff's Louisiana law claims for false arrest and battery, Defendants cite Article 213 of the Louisiana Code of Criminal Procedure, which provides that an officer may make an arrest when he "has reasonable cause to believe that the person to be arrested has committed an offense." *See* LA. CODE CRIM. PROC. art. 213. Defendants assert that Asaro did have reasonable cause to arrest because (1) his review of the surveillance video led him to conclude that there was questionable activity by plaintiff prior to his entry into the store; (2) he believed that Plaintiff had

3

acted as a lookout for the masked men based upon hand movements, apparent preparation by looking into the store, and a complete disregard of the plaintiff by the masked men; and (3) although there is some discrepancy, witnesses stated that it appeared that Plaintiff and the perpetrators ran off in the same direction after the incident.  In opposition, Plaintiff argues that "Asaro based his arrest of plaintiff entirely on 23 seconds of videotape which in no way constituted reasonably trustworthy information which would lead one to believe that plaintiff was a principal to murder."

## II.  LAW AND ANALYSIS

### 1. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See* FED. R. CIV. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*

Initially, the movant bears the burden of demonstrating the absence of material fact issues.  *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993).  The movant is not required, however, to negate the elements of the nonmovant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 323).  If the movant meets his burden, then the burden then shifts to the nonmovant, who, to avoid summary judgment, must go beyond the pleadings and designate specific facts that show that there is a genuine issue for trial.  *Id*. (citing

4

*Celotex*, 477 U.S. at 325).  Of course, unsubstantiated assertions do not constitute competent summary judgment evidence.  *Abbott*, 2 F.3d at 619 (citing *Celotex Corp.*, 477 U.S. at 324).

Before granting a motion for summary judgment, the district court must be satisfied that no reasonable trier of fact could find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 249; *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (stating that "the facts and inferences [must] point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict").  In determining whether a material issue of fact exists, the evidence and all inferences drawn therefrom must be considered in the light most favorable to the non-moving party.  *Baker v. American Airlines, Inc.*, 430 F.3d 750, 753 (5th Cir. 2005) (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005)).

## 2.  Section 1983 Claim

As a preliminary matter, the Court notes that, in his opposition memorandum, Plaintiff agrees to dismiss his claims against Walls, McCleary, Ward and Chiasson.  Therefore, in resolving the motion before it, the Court need only be concerned with the claims made against Asaro and the City.

### a.  Probable Cause

The Fourth Amendment to the United States Constitution provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. CONST. amend. IV.  For a warrantless arrest to be constitutionally legal, the arresting officer must have acted based upon probable cause.  *Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998) (citing *Baker v. McCollan*, 443 U.S. 137, 144-45 (1979)).  Probable cause exists "'when the totality of the facts and

5

circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense'." *Haggerty v. Texas S. Univ.*, 391 F.3d 653, 655-656 (5th Cir. 2004) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001) (internal quotations and citations omitted)). To have probable cause to arrest, an officer need only know with "fair probability" that the arrestee has been or is involved in the commission of a crime. *United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001). In other words, he must have more than a "bare suspicion," but his decision need not be supported by a preponderance of the evidence. *Id.* In evaluating the presence or absence of probable cause, the totality of the circumstances surrounding a particular arrest must be considered. *Brown v. Bryan County, Okl.*, 67 F.3d 1174, 1180 (5th Cir. 1995), *vacated on other grounds*, 520 U.S. 397 (1995).

In the instant case, upon reviewing all of the evidence, the Court finds that there is no dispute as to material facts and that probable cause supported Asaro's arrest of Plaintiff Gaines. According to Gaines, Asaro arrested him for first degree murder pursuant to Louisiana Revised Statute 14:30, which defines first degree murder as "the killing of a human being when the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery." *See* LA. REV. STAT. § 14:30. There is no dispute that Gaines did not actually fire the gun that killed Mrs. Nguyen. Rather, he was charged as a principal. Louisiana Revised Statute 14:24 provides that "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting an offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." *See* LA. REV. STAT. § 14:24.

Prior to arresting Gaines, Asaro viewed a tape from the surveillance cameras in the

6

convenience store. The tape displayed a four-quad view of the store. In viewing the tape, one can see one man (later identified as Gaines) walk into the store and straight to the counter. Before the store door even completely closes following the entrance of this man, two other men hurriedly enter the store and also go directly toward the store counter. One of the two asserts, "Get down ... Get down ... Get down," as the man who was already at the counter slowly backs away.[1] The woman behind the cash register shouts "no" several times. A gun shot then sounds. The man who had first entered the store exists hastily, veering to his right. The other two men run out of the store, almost immediately behind the first man. One goes to his left upon exiting, and the other, like the first man, goes right.

As mentioned previously, during the afternoon on the day of the murder, Asaro was made aware that the man on the surveillance tape who first entered the convenience store was Plaintiff Gaines, after detectives received a phone call from a policeman who worked at the same grocery store as Gaines and who recognized Gaines' picture on a 6:00 p.m. newscast. Several officers went to the store to confirm that Gaines did appear in surveillance video clips. As stated above, his manager identified Gaines when shown the video.

Prior to arresting Gaines, Asaro also had information regarding the incident from the interviews that he conducted with two witnesses, as well as from the interview that he conducted with Gaines. Although the interview with the two witnesses did not reveal much information regarding Gaines' participation or lack thereof in the crime, Gaines' interview confirmed that he did not contact police or law enforcement after the shooting occurred. He stated that this was because

---

[1] The man at the counter **does not** "get down" in accordance with the gun-weilding perpetrators' instructions.

he wanted to calm down and planned on contacting authorities when he arrived at work that night.

The evidence before Asaro prior to arresting Gaines most definitely supports Asaro's decision to arrest. Admittedly, the pictures on the surveillance tape that Asaro viewed are somewhat blurry and provide a very general view of the actions of those in the store at the time of the shooting. Nevertheless, they convey some significant information. As described above, the three men that were in the store during the shooting entered and exited the store nearly simultaneously. Further, while in the store, the gunman and his cohort do not seem to be concerned with Gaines, as it appears that they pass him right up[2] as they approach the register and do not say anything to him as he slowly backs away. Additionally, Gaines remained in the store until after the gunshot, when he quickly exited.

To say the least, Gaines' actions, when viewed in connection with the actions of the other two men, are suspicious. If he was an innocent bystander and had no connection to the armed robbers, why did he not act more quickly to remove himself from the presence of a gun? Why did the robbers not give him any instructions? How could he not have encountered the robbers outside, prior to entering the store, when he entered the store only couple of seconds before they did? And if he did encounter the two armed men outside of the store, why did he nevertheless casually enter?

The information gained by Asaro from the tape; the identification of Gaines in the surveillance tape by Gagliano and confirmation of such by Gaines' boss; and the fact that Gaines, who witnessed the murder, did not contact police regarding same all combine to provide probable cause for Gaines' arrest. Clearly, the totality of the facts and circumstances within Asaro's

---

[2]The perpetrators showed no concern whatsoever that Plaintiff might attempt to thwart the crime, or, at a minimum, serve as an eyewitness to it. This was no doubt noticed by Officer Asaro.

knowledge at the moment of arrest were sufficient for a reasonable person to conclude that Gaines had participated in the attempted robbery and the murder of the cashier/owner.

In his Memorandum in opposition to Defendants' motion, Plaintiff refers to Asaro's affidavit, wherein he states that he perceived the following actions and movements of Gaines from the surveillance video tape:

> various hand movements at the entry door, looking into the store toward the cash register area with body motion and stretching his neck, looking back to the area towards which the masked men entered the store, the activity of Gaines inside of the store when the masked men entered in that Gaines was ignored by the masked men, in that Gaines had currency in his hand during the incident, in that Gaines was given no commands by the masked men, in that Gaines bumped into the second masked man, in that Gaines was very calm and unemotional during the incident, and the fact that he was allowed to leave the store freely.

Plaintiff asserts that he is unsure of what hand movements Asaro refers to in his affidavit and that Asaro could not have perceived Plaintiff "looking into the store toward the cash register area with body motion" because the cash register cannot be seen from the front door. He further states, with respect to Asaro's assertion that Gaines was calm and unemotional during the incident, that no view on the four-quad tape that Asaro viewed shows Plaintiff's face after the entry of the robbers and, therefore, that Asaro could not possibly have made conclusions as to Plaintiff's facial expressions based on his viewing of the tape.

In his opposition, Plaintiff further makes much over the fact that Asaro failed to ask either eyewitness that he interviewed whether there was any interaction between Plaintiff and the masked men prior to their respective entries into the store. He argues that "[a] detective honestly seeking to determine Plaintiff's involvement or non-involvement in the murder" would want to know whether either eyewitness saw Plaintiff speaking to the masked men; observed any hand

9

gestures by Plaintiff; noticed that the masked men were waiting for some type of signal; or could tell whether Plaintiff and the masked men approached the store form the same street.

Finally, in his opposition, Plaintiff refers to the section of Defendants' Memorandum, wherein the reasons supporting the decision to arrest are stated. On page 3 of their Memorandum, Defendants state:

> The police decided to jail plaintiff because: 1. the eyewitnesses had him running away from the store with the perpetrators after the shooting occurred; 2. plaintiff had acted strangely after the incident, by not calling the police and reporting what had occurred; and 3. there was a distant family relationship between plaintiff and the shooter.

As to the first reason cited by Defendants, Plaintiff states the eyewitnesses in fact described Plaintiff as running in a different direction than the perpetrators after the shooting. Plaintiff further argues that his failure to contact police is not indicative of guilt, as it is a common occurrence that people in high crime neighborhoods do not report crime. Finally, as to Defendants' third reason, Plaintiff urges that Defendants' assertion is unsupported and that there is no evidence that Asaro possessed such information prior to arresting Plaintiff.

While the Court agrees with Plaintiff that the four-quad surveillance tape does not portray the amount of detail that Asaro indicates in his affidavit, that some of the statements in his affidavit are seemingly inaccurate, and that no evidence has been presented with respect to the alleged familial relationship between Plaintiff and the gunman, the Court nevertheless concludes that the cumulative information before Asaro prior to his arrest of Plaintiff supports his decision to arrest for all of the reasons stated above. Further, the Court finds that Asaro's failure to ask certain

investigatory questions that he possibly should have asked does not negate probable cause. Additionally, the Court is not persuaded by Plaintiff's argument that people in high crime areas generally do not report crimes and that Plaintiff's failure to do so is, therefore, insignificant with respect to the probable cause inquiry. As noted by Defendants, Plaintiff was not merely in the area. He was in almost arms' length away from a cold-blooded murder. That he merely went about his business afterwards could certainly be interpreted as highly suspicious behavior.

Because the Court finds that Asaro had probable cause to arrest Gaines, the Court concludes that Asaro's arrest of Gaines did not constitute a violation of his Fourth Amendment rights. Even if Asaro lacked probable cause, however, he still would not be liable to Plaintiff under section 1983 because he is entitled to qualified immunity under these circumstances.

### b. Qualified Immunity

As recognized by the Supreme Court, while individuals need to be able to seek redress for damages due to government officials' abuse of their office, allowing damages suits against governmental officials entails substantial potential social costs, including "the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987). To strike a balance between these conflicting concerns, jurisprudence has provided government officials performing discretionary functions with a qualified immunity, "shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id*. Under the doctrine of qualified immunity, such officials will be protected from liability, unless their conduct violates a clearly established constitutional or statutory right of which a reasonable person would have been aware. *Glenn*, 242 F.3d at 312. Hence, in determining

whether the qualified immunity shield protects a particular official in a particular instance, a court must conduct a two-step inquiry. *Id*. First, the court must assess whether the claimant has alleged the violation of a constitutional right. *Id*. The constitutional right must be sufficiently established and clearly defined to put a reasonable officer on notice that specific conduct violates that right. *Sanchez v. Swyden*, 139 F.3d 464, 467 (5th Cir. 1998). Second, if a constitutional violation has been alleged, the court must determine whether the conduct complained of was "objectively reasonable in light of clearly established law at the time that the challenged conduct occurred." *Glenn*, 242 F.3d at 312. In the words of the Fifth Circuit, "'[t]he touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law'." *Id*. (quoting *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000)).

A claimant seeking to demonstrate that qualified immunity does not protect a certain official has a significant hurdle to cross. *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001). As noted by the Fifth Circuit, qualified immunity "gives ample room for mistaken judgments" and "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Id*. (internal citations and quotations omitted). In the context of determining whether a search or seizure is reasonable, immunity will be lost only if there is not even *arguably* probable cause supporting the official's actions. *Id*. *See also*, *Harper v. Harris County, Texas*, 21 F.3d 597, 600 (5th Cir. 1994) (stating that "[i]f, upon viewing the evidence in the light most favorable to the non-movant, reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity"). A police officer is entitled to qualified immunity for an allegedly illegal arrest if a reasonable person in the officer's position could have believed that he had probable

cause to make the arrest. *Glenn*, 242 F.3d at 313.

As to the first prong of the qualified immunity inquiry, as noted above, the Fourth Amendment requires that an arrest be supported by a properly issued arrest warrant, or otherwise by probable cause. Plaintiff has alleged a violation of this clearly established right and has, therefore, satisfied the first prong. As to the second prong, the Court finds that Asaro's actions in arresting Gaines were objectively reasonable, for the reasons already identified. Clearly, reasonable police officers could differ on Asaro's course of action. His actions were not so egregious that all reasonable people would agree that he was his arrest of Gaines was improper. Accordingly, the Court finds that, even if Asaro lacked probable cause to arrest Plaintiff, his actions would be protected by qualified immunity. Thus, Plaintiff's section 1983 claims must be dismissed.

### c. **False Arrest and Battery Claim**s

Under Louisiana jurisprudence, to prove false arrest and imprisonment, a claimant must prove two things–(1) that he was detained, and (2) that the detention was unlawful. *Dumas v. City of New Orleans*, 803 So. 2d 1001, 1003 (La. App. 4 Cir. 2001); *Waguespack v. Judge*, 877 So. 2d 1090, 1093 (La. App. 5 Cir. 2004). To prove a battery in violation of Louisiana Civil Code article 2315, a claimant must demonstrate that he was the victim of an unlawful touching by another that was done without justification or excuse. *Boone v. Reese*, 889 So. 2d 435, 440 (La. App. 3 Cir. 2004). For all of the reasons stated above, the Court finds that Plaintiff's detention was not unlawful. Accordingly, his false arrest claim based on Louisiana law must be dismissed.

### III.  CONCLUSION

For all of the foregoing reasons, the Court finds that no material issues of fact exist and that no reasonable fact finder could find in Plaintiff's favor on any of the claims asserted in this

Complaint.  Therefore, **IT IS HEREBY ORDERED** that Plaintiff's claims are all **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 1st day of September, 2006.

_____
**Kurt D. Engelhardt**
**United States District Judge**